**UNITED STATES of America,**
**Appellee–Cross–Appellant,**

v.

**Warren NUZZO, Defendant–Appellant–**
**Cross–Appellee.**

No. 03–1652, 03–1705.

United States Court of Appeals,
Second Circuit.

Argued: May 12, 2004.

Decided: Oct. 1, 2004.

Louis R. Aidala, New York, NY, for Defendant–Appellant–Cross–Appellee.

Lee J. Freedman, Assistant United States Attorney (Emily Berger, Assistant United States Attorney, of counsel; Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Appellee–Cross–Appellant.

Before: FEINBERG and CABRANES, Circuit Judges, and KRAVITZ,* District Judge.

JOSÉ A. CABRANES, Circuit Judge.

Defendant–Appellant Warren Nuzzo appeals from an order and judgment of the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge* ) sentencing Nuzzo principally to 136 months' incarceration following his guilty pleas to importing, possessing, and possessing with intent to distribute substantial quantities of cocaine, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B)(ii) and 841(a)(1). Nuzzo appeals the order and judgment on the grounds that, *inter alia,* the District Court erred in enhancing his sentence for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. The Government cross-appeals on the grounds that the District Court erred both in awarding Nuzzo a safety-valve deduction, U.S.S.G. §§ 2D1.1(b)(6) and 5C1.2(a) and 18 U.S.C. § 3553(f), and in downwardly departing pursuant to U.S.S.G. § 5K2.0. We reverse the District Court's decision to enhance Nuzzo's sentence for an abuse of a position of trust, vacate with respect to both of the Government's claims on cross-appeal, and remand the cause to the District Court for resentencing.

## BACKGROUND

On August 28, 2002, Nuzzo, a United States citizen, was arrested at John F. Kennedy International Airport ("JFK") upon his disembarkment from a flight arriving from Guyana, for attempting to smuggle approximately twelve kilograms of cocaine into the United States. Nuzzo was indicted by a grand jury on October 21, 2002, for (1) importing more than five kilograms of cocaine in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(1)(B)(ii); and (2) possessing with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Each of the two counts carried a mandatory minimum ten-year sentence. *See* 18 U.S.C. §§ 3551 *et seq.,* 841(b)(1)(A)(ii)(II). On March 5, 2003, Nuzzo pleaded guilty to both counts of the indictment and on October 9, 2003, the District Court entered judgment sentencing Nuzzo principally to 136 months' imprisonment. Nuzzo now appeals that

---

* The Honorable Mark R. Kravitz, United States District Judge for the District of Connecticut, sitting by designation.

sentence on a variety of grounds. The Government cross-appeals.

## I. The Arrest

Nuzzo was stationed at JFK as an inspector for the Immigration and Naturalization Service [1] ("INS") from June 1991 to April 2002. He was fired in April 2002 for conduct unbecoming an officer. Prior to his termination, however, Nuzzo was recruited by a Guyana-based drug-dealing operation to assist in the smuggling of cocaine into the United States from Guyana. Nuzzo has stated his belief that he was recruited due, at least in part, to knowledge of the immigration and customs processes he ostensibly gleaned from his service as an INS inspector.

On August 28, 2002 (subsequent to the termination of Nuzzo's employment by the INS), Nuzzo and a woman named Jean Campbell arrived at JFK from Guyana. Because the Government had previously received a tip concerning Nuzzo's trip, he and Campbell were arrested before reaching the usual customs declaration checkpoint. Nuzzo's suitcase was found to have 11.99 kilograms of cocaine.

Upon his arrest, Nuzzo waived his *Miranda* rights,[2] and admitted to knowingly importing cocaine into the United States. He explained that Campbell, with others, had paid for his flight and assisted him in his smuggling activities. Those smuggling activities had been planned in Georgetown,

Guyana, under the leadership of Mark Morgan, Campbell's former son-in-law. Had he not been arrested, Nuzzo's plan—in accordance with the instructions given to him under the leadership of Morgan in Guyana—was to proceed to his residence in Queens, where subsequently he would receive further instructions. Nuzzo would have been paid $5,000 for successfully smuggling the cocaine.

Nuzzo also admitted that in December 2001, while he was still employed as an inspector for the INS, he had successfully smuggled seventeen kilograms of cocaine from Guyana into the United States through JFK at the instance, and with the guidance, of Morgan. Nuzzo traveled to and from Guyana with his then-fiancée, Simone DeFreitas. DeFreitas and her sister, Marcia Figueroa, made arrangements to sell the seventeen kilograms of cocaine in the United States. The proceeds were wire-transferred to Morgan in Guyana and Nuzzo was paid $8,000.

Nuzzo also admitted that he helped launder drug proceeds. Although the amount of money that he admitted to helping launder and wire to Guyana varied in subsequent proffer sessions, upon questioning at JFK on August 28, 2002, Nuzzo admitted that he laundered $20,000.

Campbell, too, waived her *Miranda* rights. Although she equivocated on most matters during questioning, eventually she admitted that (1) her final destination

---

1. The INS has ceased to exist as an independent agency, certain of its functions having been transferred as of March 1, 2003, to the Department of Homeland Security, *see* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002), and the functions at issue here are being performed by what is now called the Bureau of Citizenship and Immigration Services. Because the agency was still the INS at all times pertinent to this case, we will refer it as such throughout this opinion.

2. Nuzzo's statements made during interrogation, after his arrest and while in custody, are properly part of the record and available to us because he makes no objection that he did not "waive effectuation of these rights [against self-incrimination, as provided by the Fifth Amendment]; ... voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

within the United States was Nuzzo's address; (2) she had received an unspecified amount of money from Nuzzo; and (3) Morgan, the cocaine-distribution leader in Guyana under whom Nuzzo had admitted he was operating, was her former son-in-law. Campbell's purse contained a key that unlocked both her luggage and Nuzzo's matching luggage—the latter containing the 11.99 kilograms of cocaine.

Nuzzo consented to a search of his residence in Queens. That search yielded an INS uniform jacket, a nine-millimeter Beretta handgun, an INS raid vest with Kevlar inserts,[3] a federal law enforcement inspector's badge, an expandable baton, an INS date stamp, ammunition and miscellaneous documents.

Nuzzo and Campbell were charged together by complaint with conspiracy to import cocaine in violation of 21 U.S.C. §§ 952(a) and 960.

## II. Nuzzo's Inconsistent Statements

Nuzzo made some efforts to disclose his knowledge of, and participation in, the Guyana-based drug-smuggling operation in his post-arrest statements, and in the course of three proffer sessions with federal prosecutors (in October 2002, January and August 2003) and submissions and testimony at his sentencing proceeding, see Oct. 9, 2003, Tr., at 40–86. In doing so, Nuzzo was unable to provide a consistent account of his activities.

For example, he made conflicting statements about (1) how many of his past trips to Guyana had a drug-related purpose;[4] (2) whether Campbell was a participant in the drug-smuggling operation;[5] (3) what amount of drug proceeds he wire-transferred to Guyana;[6] (4) whether he had seen, and had a telephone number for, "Red Man," a prominent Guyana-based cocaine exporter to the United States;[7] and (5) whether he had personally delivered a

---

3. "Kevlar" is a trademarked "high-strength, low-density synthetic aramid fiber[ ]" used for, among other things, bullet-proof clothing. See N.V. Akzo v. E.I. Du Pont de Nemours, 810 F.2d 1148, 1149 (Fed.Cir.1987).

4. Nuzzo first stated after his arrest that of his numerous trips to Guyana in the years preceding his arrest, only two had any drug-related purpose; the rest were purely for "spiritual" reasons. He reiterated this during the January 2003 proffer session. See Oct. 9, 2003, Tr., at 37–38. Later, Nuzzo clarified that by "spiritual reasons," he sometimes meant "having sex with many different women at the same time and in the same night," and that there were other trips, "a couple of times," that had a drug-related purpose that he had previously denied. See id. at 38, 47; see also Government's Br. at 35, 35 n. 9.

5. During post-arrest interviews, Nuzzo admitted that Campbell was a participant in the smuggling operation. At the October 2002 proffer session, however, Nuzzo recanted those statements and insisted that Campbell was innocent of any wrongdoing. At the January 2003 proffer session, Nuzzo flipped again and admitted that he lied to authorities

in October 2002. Nuzzo explained that he had lied "because he thought [he and Campbell] shared a romantic relationship, and [only told the truth] when he learned that the amorous feelings were not mutual." See Presentence Investigation Report, at ¶ 12.

As a result of Nuzzo's lying about Campbell's role in the smuggling activities during the October 2002 proffer session, the Government dropped all charges against her. See Government's Br. at 26–27.

6. During his post-arrest interviews, Nuzzo admitted that he had wire-transferred at least $20,000 in drug proceeds to Guyana. He later recanted this statement, said that he had only wire-transferred $2,000 of what might have been drug money, and explained that he said (the ostensibly incorrect) $20,000 "out of fear." See Oct. 9, 2003, Tr., at 64.

7. Nuzzo stated in January 2003 that he "had never laid eyes upon 'Red Man' in [his] life" and "swore upon God" that he was telling the truth. See Oct. 9, 2003, Tr., at 68. He later admitted that this was untrue. See id. at 49–50. He attributed his lying behavior to his being "a human being. [He] got—[he was]

suitcase full of drugs to a dealer in a parking lot in the United States.[8]

The District Court concluded at Nuzzo's sentencing that "Mr. Nuzzo is incapable of answering questions truthfully and wasn't telling the truth here [during the sentencing proceeding].... Any person with a modicum of common sense would be able to reach that conclusion without a moment's hesitation." Oct. 9, 2003, Tr., at 97.

## III. Sentencing

The District Court set Nuzzo's base offense level at 34, *see* Oct. 9, 2003, Tr., at 34, 111; U.S.S.G. § 2D1.1(c)(3),[9] and applied the following adjustments: (1) a two-level enhancement, pursuant to U.S.S.G. § 3B1.3,[10] for abuse of a position of trust, *see* Oct. 9, 2003, Tr., at 25; (2) a two-level enhancement, pursuant to U.S.S.G. § 3C1.1,[11] for obstructing justice, *see* Oct. 9, 2003, Tr., at 29; (3) a two-level acceptance of responsibility adjustment, *see* Oct. 9, 2003, Tr., at 29; U.S.S.G. § 3E1.1(a);[12] and (4) a two-level safety-valve deduction, *see* Oct. 9, 2003, Tr., at 109; U.S.S.G. §§ 2D1.1(b)(6)[13] and 5C1.2(a);[14] 18 U.S.C. § 3553(f).[15]

The Court declined to grant Nuzzo (1) an additional one-level adjustment for ac-

---

scared and [is] not good at talking in front of people." *Id.* at 69.

Nuzzo stated, in August 2003, that he never possessed Red Man's telephone number. He then admitted the opposite when confronted with a piece of paper, taken from his wallet, upon which Red Man's number was written in Nuzzo's handwriting. *See* Oct. 9, 2003, Tr., at 69–70.

8. Nuzzo admitted during the August 2003 proffer session that, in December 2001, he personally handed a suitcase full of drugs to an individual in the parking lot of a Pathmark store. But at his sentencing proceeding in October 2003, Nuzzo claimed that another individual, Ken Campbell, handed off the suitcase. *See* Oct. 9, 2003, Tr., at 77. Nuzzo explained that he had lied in August 2003 because of his relationship with Ken Campbell's mother: "it was like a very hard process for me to divulge this information that I know it's really hurting [Ken Campbell's mother] and put her children in danger of going to prison." *Id.* at 78.

9. U.S.S.G. § 2D1.1(c)(3) lists a base offense level of 34 for the unlawful importation or possession of "[a]t least 15 KG but less than 50 KG of Cocaine."

Because Nuzzo was sentenced in October 2003, we refer, throughout this opinion, to the Sentencing Guidelines in effect as of November 1, 2002.

10. U.S.S.G. § 3B1.3 provides, in pertinent part, that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly

facilitated the commission or concealment of the offense, increase by 2 levels."

11. U.S.S.G. § 3C1.1 provides that:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

12. U.S.S.G. § 3E1.1(a) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."

13. U.S.S.G. § 2D1.1(b)(6) provides that:

If the defendant meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2 levels.

14. U.S.S.G. § 5C1.2(a) provides in part that:

Except as provided in subsection (b), in the case of an offense under 21 U.S.C. § 841, § 844, § 846, § 960, or § 963, the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5) ....

15. 18 U.S.C. § 3553(f) provides that:

ceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b);[16] and (2) a mitigating-role adjustment pursuant to U.S.S.G. § 3B1.2(b).[17]

Having made these determinations, the Court should have sentenced Nuzzo based upon a final offense level of 34[18] and, accordingly, within a range of 151 to 188 months' incarceration.[19] The Court made a computation error, however, and thought that its determinations had yielded a final offense level of 32, which would have yielded a range of 121 to 151 months' incarceration. Laboring under that misunderstanding, the Court sentenced Nuzzo to the midpoint of what it thought was the appropriate range. *See* Oct. 9, 2003, Tr., at 109.

Judge Glasser subsequently realized his mistake ("I calculated a two-level adjustment twice for acceptance of responsibility," *see id.* at 111) and admitted that, according to the sentencing determinations he had made, Nuzzo should have been sentenced at a final offense level of 34, within a range of 151 to 188 months. Nevertheless, Judge Glasser declined to change Nuzzo's 136–month sentence, and explained that he would keep Nuzzo's sentence at 136 months "by [*sua sponte* ] downwardly departing an additional two points pursuant to [U.S.S.G. § ] 5K2.0 and

(f) Limitation on applicability of statutory minimums in certain cases.—Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act (21 U.S.C. 841, 844, 846) or section 1010 or 1013 of the Controlled Substances Import and Export Act (21 U.S.C. 960, 963), the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sentence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act [21 USCS § 848]; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

**16.**  U.S.S.G. § 3E1.1(b) provides that:

If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by . . . timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

**17.**  U.S.S.G. § 3B1.2(b) provides that "[i]f the defendant was a minor participant in any criminal activity, decrease by 2 levels."

**18.**  The final offense level should have been 34 according to the Court's conclusions on various sentence adjustments. 34 (base offense level) + 2 (abuse of trust) + 2 (obstruction of justice)—2 (acceptance of responsibility)—2 (safety-valve) = 34.

**19.**  *See* U.S.S.G. § 5A, Sentencing Table.

mitigating factors which weren't contemplated." *Id.* at 112.

## DISCUSSION

On appeal, Nuzzo challenges his sentence on the grounds that, *inter alia*,[20] the District Court erred in enhancing his sentence two levels for abuse of trust. The Government cross-appeals, claiming that the District Court erred in (1) awarding Nuzzo a two-level safety-valve deduction; and (2) downwardly departing two levels for mitigating circumstances.

## I. The Abuse of Trust Enhancement

The District Court applied a two-level enhancement, pursuant to U.S.S.G. § 3B1.3, *see* note 10, *ante*, for Nuzzo's abuse of a position of trust in a manner that facilitated his offense conduct or concealment thereof. Nuzzo argues that that the District Court committed clear error in doing so. Proper application of § 3B1.3 requires satisfaction of two requirements: first, that Nuzzo occupied a "position of trust," and second, that Nuzzo abused that position of trust to commit or conceal his crimes. *See* note 10, *ante*.

### A. Whether Nuzzo Occupied a Position of Trust

Nuzzo does not dispute that his position as an INS inspector constituted a position of trust in certain respects. *See* Appellant's Br. at 19; *see also* Government's Br. at 15–16. Nuzzo admits that he "had discretion in the course of his employment ... checking the entry documents of persons entering the country ... [and had he] improperly admit[ted] someone with defective or deficient documentation," then he would have been abusing a position of

trust. Appellant's Br. at 16. *Cf. United States v. Brickey,* 289 F.3d 1144, 1155 (9th Cir.2002) ("Clearly, [an INS border] position is one of public trust characterized by professional discretion."). We turn, therefore, to a consideration of the second prong of § 3B1.3—whether Nuzzo abused his position of trust in a manner that facilitated the commission or concealment of the offense conduct for which he was charged.

### B. Whether Nuzzo Abused His Position of Trust Within the Meaning of § 3B1.3

We review for clear error the second prong of § 3B1.3. *See United States v. Santoro,* 302 F.3d 76, 80 (2d Cir.2002) ("We accord due deference to the district court's application of the guidelines to the facts ... and we will not overturn the district court's finding that the defendant abused a position of trust to significantly facilitate his offense unless it is clearly erroneous.") (quotation marks and citation omitted).

The Government must meet its burden of proving satisfaction of the second prong of § 3B1.3 by a preponderance of the evidence, *see United States v. Desimone,* 119 F.3d 217, 228 (2d Cir.1997), proving that "the position of ... trust must have *contributed* in some significant way to *facilitating* the commission or concealment of the offense (*e.g.,* by making the detection of the offense ... more difficult)," U.S.S.G. § 3B1.3, comment. (n.1) (emphasis added).

It is not sufficient that a defendant enjoyed a position of trust, and thus had an opportunity to commit a difficult-to-detect wrong. That would merely satisfy the

---

**20.** Nuzzo also challenges the District Court's decisions (1) to award only a two-level, as opposed to a three-level, adjustment for acceptance of responsibility, *see* Appellant's Br.

at 20–23; (2) to enhance Nuzzo's sentence for obstruction of justice, *see id.* at 24–27; and (3) to refuse to grant Nuzzo a "minor role" adjustment, *see id.* at 28–29.

first of the two prongs of § 3B1.3. Rather, (1) the defendant must have enjoyed a "superior" position, relative to other potential perpetrators, as a result of a trust relationship, *see United States v. Castagnet*, 936 F.2d 57, 62 (2d Cir.1991); and (2) the defendant must have capitalized on that superior position in committing the offense conduct, *see* U.S.S.G. § 3B1.3, comment. (n.1).

■ The Government argues that "relative to all people in a position to smuggle drugs through JFK Airport, Nuzzo was in a superior position as a result of his service as a JFK Airport INS inspector." Government's Br. at 16. In the Government's view, Nuzzo's "personal relationship with other inspectors, his insight into law enforcement's methods of detecting drug smugglers and his INS credentials could do nothing but enhance Nuzzo's ability to smuggle drugs through the airport." *Id.* at 17. The Government offers Nuzzo's successful smuggling of seventeen kilograms of cocaine through JFK in December 2001 as proof that he enjoyed such a position and that he capitalized on that position. Finally, the Government asks us to look to Nuzzo's own statements, upon arrest, that he believed that he had been recruited to smuggle drugs for the Guyana outfit "due to his profession and [because] he knew his way through the Immigration and Customs processes." *Id.* at 16–17.

In the particular circumstances presented here, these arguments are unconvincing and insufficient to establish, by a preponderance of the evidence, that Nuzzo's position of trust facilitated the commission or concealment of his crimes. The only evidence that Nuzzo was recruited for his criminal activity because of his INS position is Nuzzo's own post-arrest statement (one of many that the District Court deemed could be disbelieved by anyone with a modicum of common sense).[21] Even if Nuzzo's testimony were credited in this respect, his asserted recruitment because of "special skills" relevant to the projected crime would not prove that he actually had such skills or that he used them in a particular criminal enterprise. Indeed, it is altogether possible for an individual to be recruited for a specific job due to supposed special skills, and to succeed at that job, without actually having the skills or using them.

Although the Government suggests that Nuzzo's personal relationships with other INS inspectors gave him "insight" into the law enforcement agencies' drug-smuggling detection techniques, *see* Government Br. at 17, and that he used his credentials to facilitate the crimes with which he was charged, *id.*, none of this is explained in any detail nor supported by the findings of the District Court. For example, nothing in the record supports the proposition that Nuzzo maintained personal relationships with government inspectors that facilitated his crime, or that Nuzzo had special knowledge about the detection of drug smuggling that he used in the commission of the offense with which he was charged. Moreover, there is no suggestion in the record that Nuzzo used any INS credentials in the (successful) December 2001 or in the (unsuccessful) March 2002 efforts to smuggle cocaine into the United States.

---

**21.** Not only does the record provide no corroboration for Nuzzo's statements that he was sought out by the Guyana-based drug-smuggling operation because of his INS post, conversely, the record suggests a simpler and more likely explanation of Nuzzo's entry into drug smuggling—that Nuzzo was previously romantically involved with Simone DeFreitas; he was short on money; and, due to acquaintances met through DeFreitas and others, he was afforded the opportunity to smuggle drugs for money, an opportunity which he then took. *See, e.g.*, Oct. 9, 2003, Tr., at 42–43.

We find unconvincing the Government's argument that Nuzzo's successful importation of seventeen kilograms of cocaine in 2001 provides some proof that Nuzzo abused his position of trust in the commission of his crimes. First, it is surely possible successfully to smuggle cocaine into the country without the use of special skills or the abuse of a position of trust. Second, we know of no authority for the notion that evidence of a successful prior crime, standing alone, can support a conclusion that "special skills" or an abuse of a position of trust accounted for the success of later attempts.

The cases in which this Court has held that a position of trust was abused in a manner appropriately relevant to a § 3B1.3 enhancement[22]—and the cases from other courts that this Court has cited as illustrative of such abuse[23]—contemplate a closer nexus between a defendant's position of trust (or special skills learned or exercised in connection with such a position) and the defendant's offense conduct than is present here. We do not doubt that Nuzzo occupied, for a time, a position of trust that might have afforded him opportunities to commit difficult-to-

detect wrongs because of his superior position. Nor do we minimize society's legitimate concern that an INS agent might engage in drug-smuggling activities as a direct result of his designated port-of-entry post. But in the instant case, we do not find support in the record of a direct nexus between a position of trust, the abuse of that trust, and the facilitation of the commission or concealment of the relevant offense conduct.

Accordingly, we reverse the District Court's decision to enhance Nuzzo's sentence for abuse of a position of trust pursuant to § 3B1.3, and we instruct the District Court, on remand, to resentence Nuzzo without such an enhancement.

## II. The Safety–Valve Deduction

The District Court awarded Nuzzo a two-level "safety valve" deduction, see Oct. 9, 2003, Tr., at 109; U.S.S.G. §§ 2D1.1(b)(6) and 5C1.2(a); 18 U.S.C. § 3553(f); notes 13–15, ante. In order to award a safety-valve deduction, the District Court must find that an offender has proved, by a preponderance of the evidence, satisfaction of all five safety-valve criteria. See United States v. Conde, 178

---

**22.** Instances in which this Court has held that a defendant's position of trust contributed to the commission or concealment of a crime include those in which: an armed security guard, a co-conspirator in a robbery, used information to which he had access by virtue of his position to provide necessary details to his co-conspirators, see United States v. Parker, 903 F.2d 91, 104 (2d Cir.1990); chief officers of financial institutions used authority afforded to them by their positions to misallocate bank funds and to subsequently conceal those misallocations, see United States v. McElroy, 910 F.2d 1016, 1027–28 (2d Cir. 1990); and a postal worker abused his superior position with the United States Postal Service that afforded him access to large amounts of cash without accounting controls, see United States v. Melendez, 41 F.3d 797, 799 (2d Cir.1994).

**23.** Instances in which other courts have found § 3B1.3 satisfied—and that this Court has identified as helpful, see United States v. Castagnet, 936 F.2d 57, 60–62 (2d Cir.1991)—include those in which: a police officer, in his official capacity, took drugs from dealers, and in turn provided those dealers with police services and confidential information, see United States v. Ruiz, 905 F.2d 499 (1st Cir. 1990); a bank janitor used keys and unsupervised access, only provided to him to allow him to do his janitorial duties, to facilitate the theft of money from the bank vault, see United States v. Drabeck, 905 F.2d 1304 (9th Cir. 1990); and a truck driver used his unsupervised access, while solely responsible for—and in temporary possession of—others' possessions, to steal, sell and destroy them, see United States v. Hill, 915 F.2d 502 (9th Cir. 1990).

F.3d 616, 621 (2d Cir.1999). At issue in this appeal is the fifth criterion, that "not later than the time of the sentencing hearing, the defendant [must have] truthfully provided to the Government all information and evidence [he] has concerning the offense ... that were part of the same course of conduct or of a common scheme or plan ...." U.S.S.G. § 5C1.2(a)(5).

The Government argues on cross-appeal that the District Court erred in awarding Nuzzo a safety-valve deduction, *see* Government's Br. at 32–38, drawing our attention to the District Court's statements with respect to Nuzzo's untruthfulness and the host of inconsistent statements made by Nuzzo.

We review a district court's factual findings for clear error, and its interpretation of the Sentencing Guidelines *de novo.* *See United States v. Jeffers,* 329 F.3d 94, 97 (2d Cir.2003). We acknowledge that "[t]he plain language of the statute [18 U.S.C. § 3553(f) ] requires the district court to make its own determination whether [a defendant] satisfied the safety-valve provision," *United States v. Gambino,* 106 F.3d 1105, 1110 (2d Cir.1997), and that we owe a district court deference with respect to factual findings, especially those based on witness credibility, *see Conde,* 178 F.3d at 620.

▇ It is precisely because we owe such deference to the District Court's assessment of Nuzzo's credibility that we conclude that the District Court erred in affording him the benefit of a safety-valve deduction. On the day of sentencing, the District Court stated:

> I don't have to really document my conclusion that Mr. Nuzzo is incapable of answering questions truthfully and *wasn't telling the truth here this morning or this afternoon.* I don't have to document that. Any person with a modicum of common sense would be able to reach that conclusion without a moment's hesitation.

Oct. 9, 2003, Tr., at 97 (emphasis added). Shortly thereafter, the District Court stated:

> I don't believe that Mr. Nuzzo is entitled to the safety valve ... [because] I don't believe that Mr. Nuzzo has provided the information which he has regarding the enterprise in which he was engaged. And I don't think he has carried the burden of proof in that regard.

*Id.* at 100. Our review of the record shows that these statements by the District Court were amply justified. Nuzzo made inconsistent statements about a host of issues pertinent to his offense conduct, and his inconsistency spanned the long period (approximately thirteen months) between his post-arrest statements and his statements before the District Court on the day of his sentencing. *See* Background II, *ante.*

We are unable to reconcile the District Court's assessment of Nuzzo's lack of credibility and the long record of Nuzzo's untruthfulness with the fifth safety-valve criterion. U.S.S.G. § 5C1.2(a)(5) requires that the defendant provide complete[24] in-

---

24. *See, e.g.,* U.S.S.G. § 5C1.2(a)(5) ("*all* information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan") (emphasis added); *Gambino,* 106 F.3d at 1111–12 (emphasizing the breadth of scope in the § 5C1.2(a)(5) requirement of "all" information, and holding that the defendant was not entitled to a safety-valve deduction when he had failed to answer truthfully the Government's questions regarding the drug trafficking activities of his accomplices, even in situations in which the defendant was not personally involved, except by "common purpose" and similarity of *modus operandi* ); *id.* at 1112 (holding that defendant had failed to satisfy the § 5C1.2(a)(5) criterion by failing truthfully to disclose his

formation about his offense conduct and related activity, that he subjectively believes that information to be true, *see United States v. Reynoso*, 239 F.3d 143, 146–150 (2d Cir.2000), and that the information provided is objectively true, *see id.*

In these circumstances, we vacate so much of the sentence as granted Nuzzo a safety-valve deduction, and remand to the District Court for a reconsideration of the record, with instructions to re-sentence Nuzzo without such a deduction absent findings of fact by the District Court, supported by the record, to support a conclusion that he has met all five of the requisite criteria for such a deduction.[25]

### III.   The Downward Departure

Upon discovery of a Guideline range miscalculation, *see* Oct. 9, 2003, Tr., at 111; Background III, *ante,* and a mistaken sentence based upon that miscalculation, the District Court decided to stand firm on the sentence duration and, in order to reconcile the discrepancy, awarded a downward departure for "mitigating factors which weren't contemplated." Oct. 9, 2003, Tr., at 112. Subsequently, the District Court recorded the departure in its written order and judgment as "a 2 level departure pursuant to [U.S.S.G. § ] 5K2.0 for mitigating circumstances not contemplated by the [Sentencing] Commission." [A 57]

The Government argues on cross-appeal that the District Court erred in awarding Nuzzo this departure on at least three grounds: (1) the departure was unjustified, *see* Government's Br. at 46–49; (2) the District Court failed to provide the Government advance notice that it was considering a departure, thereby depriving the Government of an opportunity to address the issue, *see id.* at 46; and (3) the District Court failed to satisfy the requirement of written, specific reasons for a departure as stated in the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub.L. No. 108–21, 117 Stat. 650 (2003), codified at 18 U.S.C. § 3742(e)(3)(B) ("PROTECT Act" or

---

knowledge of the drug trafficking family with which he cooperated, and the name of his past drug supplier); *see also United States v. Rodriguez,* 69 F.3d 136, 143–44 (7th Cir.1995) (denying safety-valve to defendant who failed to truthfully disclose names of suppliers or buyers) (cited with approval in *Gambino,* 106 F.3d at 1112).

**25.**  We recognize that what is required of Nuzzo is not that he have been consistently honest throughout his dealings with the Government, but rather, that as of the time of his sentencing, he must have rendered an exhaustive and truthful portrayal of his knowledge of his offense conduct and all related activity. *See United States v. Schreiber,* 191 F.3d 103, 106–09 (2d Cir.1999) (holding that, despite prior lies and omissions, so long as the defendant's disclosure was complete and truthful as of the time of sentencing, a safety valve was merited).

While a district court may find the fifth criterion of the safety valve satisfied despite prior lies and omissions, neither a district court nor this Court is precluded from considering those prior lies and omissions in determining whether the defendant has met his burden of proving that the information provided as of sentencing is complete and truthful. *Cf. United States v. Fletcher,* 74 F.3d 49, 56 (4th Cir.1996) (holding that, as the district court had determined that the defendant had lied previously, "it is not illogical to assume that the judge similarly determined that [the defendant] failed to comply with the fifth [safety-valve] condition" as of sentencing) (cited with approval by *Schreiber,* 191 F.3d at 107); *United States v. Edwards,* 65 F.3d 430, 433 (5th Cir.1995) (holding that, when the defendant had made previous and ongoing inconsistent statements, the district court did not err in denying the safety valve because, "[i]n these circumstances, the district court could have concluded that [the defendant] did not ... truthfully provide all relevant information") (cited with approval by *Schreiber,* 191 F.3d at 107).

"Act"), *see id.* at 39–46. We agree with each of these arguments.

■ It is undisputed that the District Court's explanation of its decision to depart was conclusory and limited to a sentence in the written order and judgment invoking a provision of the Sentencing Guidelines. It is also undisputed that no notice was given to the Government by the District Court of its intention to depart downward.[26]

■ Accordingly, we vacate the District Court's decision to depart downward, and we remand the cause with instructions that the District Court re-evaluate whether Nuzzo is entitled to a downward departure. If the District Court intends seriously to consider such a departure, it shall provide the Government prior notice of its intent to do so. If the District Court, following a hearing on notice, determines that a departure is indeed warranted, we direct the Court to adhere to the requirements of the PROTECT Act that the Court state in open court, as well as "with specificity in the written order and judgment," reasons for imposing a sentence that differs from the prescription of the Sentencing Guidelines. *See* 18 U.S.C. §§ 3742(e)(3) and 3553(c)(2).

#### CONCLUSION

For the reasons stated above, we reverse the District Court's decision to enhance Nuzzo's sentence for abuse of a position of trust, and we vacate the District Court's decisions to award Nuzzo a safety-valve deduction and a downward departure. We remand the cause to the District Court, and on remand, we instruct the District Court to (1) re-evaluate whether Nuzzo is entitled to a safety-valve deduction; (2) re-consider, on notice to the Government as appropriate, whether Nuzzo is entitled to a downward departure; and, if it finds that such a departure is warranted, (3) state in open court, and in a written order and judgment, its reasoning in a manner that complies with the requirements of the PROTECT Act.

We have considered Nuzzo's other arguments on appeal, *see* note 20, *ante,* and we hold that they are all without merit. Accordingly, in all other respects the judgment of the District Court is affirmed.

---

**26.** "Before sentence is imposed, the district court must give the government both notice of the court's intention to depart, including the factors that the judge is planning to rely upon, and some brief explanation as to why these factors warrant a departure, and an opportunity to be heard as to why the contemplated departure is unwarranted." *United States v. Thorn,* 317 F.3d 107, 129 (2d Cir.2003).